UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SERENITY HOUSE RESIDENTIAL CARE SERVICES, LLC, et al.,

Plaintiffs,

v.

WELLVANCE COMMUNITY MENTAL HEALTH AUTHORITY, et al.,

Defendants.
_______________________________/

Case No. 2:26-cv-13582

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND PRELIMINARY INJUNCTION ORDER**

In this civil rights case, Plaintiffs allege that Defendants wrongfully terminated a care-facility contract on account of racial discrimination and retaliation. Along with their Complaint, Plaintiffs filed a motion for a preliminary injunction ("PI") or temporary restraining order ("TRO") on September 23, 2026, seeking an order to stop four dependent adults from being uprooted from Plaintiffs' residential care facility on October 1, 2026, the day the contract would be terminated. On September 29, 2026, this Court heard argument and took evidence on Plaintiffs' motion. That same day, this Court orally granted Plaintiffs' request for a PI and indicated that this written opinion would follow.

# I. BACKGROUND[1]

## A. The Agreement

Plaintiff Serenity House Residential Care Services, LLC ("Serenity House"), is a Michigan company that operates adult foster-care homes in Warren and Detroit. ECF No. 1 at PageID.5. Plaintiff Kennedy Shannon is an African-American woman and founder, owner, and CEO of Serenity House. *Id.* Defendant Wellvance Community Mental Health Authority ("Wellvance") is a municipal entity that provides public mental-health services and programs under the Michigan Mental Health Code, MICH. COMP. LAWS § 330.1001 *et seq*. *Id.* at PageID.6. Wellvance operates primarily in three counties in northern Michigan. *Id.*

In September 2025, Wellvance CEO, Defendant Patricia Otremba, executed a contract ("the Agreement") between Wellvance and Shannon on behalf of Serenity House. *Id.* at PageID.7. The Agreement became effective October 1, 2025, wherein Serenity House agreed to provided residential services and personal care for four of Wellvance's consumer adults—Plaintiffs John Doe 1-4—who were adjudicated as

---

[1] The following facts come from the Complaint, which are taken as true when considering a PI, and the evidence presented at the motion hearing. *See Elrod v. Burns*, 427 U.S. 347, 350 N.1 (1976). Courts may consider "less complete" evidence, including hearsay, at the preliminary-injunction stage. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Jackson et al. v. Priority Waste LLC, et al*, No. 25-cv-11867, 2026 WL 2597819, at *9 (E.D. Mich. Sept. 2, 2026) ("In deciding a motion for a PI . . . a court may consider the entire record, including affidavits and other hearsay evidence.") (citation modified).

legally incapacitated. *Id.* at PageID.5, 7. Serenity entered the contract with Wellvance as an independent contractor. ECF No. 1-2 at PageID.64 ("[I]t is expressly understood and agreed that [Serenity's] relationship to [Wellvance] is that of an independent contractor.").

According to the terms of the contract, "[t]he Agreement runs through September 30, 2026 and thereafter continues month-to-month for up to twelve months." ECF No. 1 at PageID.8; *see also* ECF No. 1-2 at PageID.49. The Agreement provides that it "is contingent upon [Wellvance's] receipt of sufficient federal, State and local funds." ECF No. 1-2 at PageID.46. The Agreement further provides a number of specific reasons why it could be terminated effective immediately, as well as stating that either party "may terminate this Agreement for any reason by providing the other party with THIRTY (30) days prior written notification." *Id.* at PageID.49–50.

**B. Doe Complaint**

During the Agreement period, Wellvance received a complaint from Plaintiff John Doe 1 about their[2] experience living at a Serenity House facility. ECF No. 1 at

[2] Although all four adult Plaintiffs are referred to as John Does, not all are men. ECF No. 2 (sealed). This Court uses "their" as a singular, gender-neutral pronoun when referring to the adults to maintain their privacy without misgendering them. *See Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 785 (6th Cir. 2025) (Bush, J., concurring) (noting the modern use of "they" as a singular, gender-neutral pronoun); *see also Scottsdale Ins. Co. v. New Century Builders & Developers, LLC*, 696 F. Supp. 3d 117, 123 n.3 (E.D. Pa. 2023) ("Merriam-

PageID.12. According to Shannon's testimony at the PI hearing, the complaint was from a diabetic resident who demonstrated patterns of attention-seeking behavior, including intentionally spiking their blood sugar. ECF No. 17 at PageID.466–67. Shannon stated that Serenity House staff complied with Doe 1's doctor who ordered Serenity House to lock sugary snacks in a cabinet. *Id.* at PageID.467. Doe 1 then complained that Serenity House was restricting food. *See id.* By February 2026, Wellvance had investigated and substantiated the complaint. *See id.*; *see also* ECF No. 1 at PageID.12. Shannon and Doe 1's guardian, Plaintiff Leah Chrivia, disagreed with the substantiation, so Shannon disputed it, explaining that the restriction was necessary for the safety and wellbeing of Doe 1. ECF Nos. 1 at PageID.12; 17 at PageID.467–68.

On February 27, 2026, Otremba called Chrivia to discuss the Doe 1 complaint. ECF No. 1 at PageID.13. During the call, Otremba asked Chrivia what she thought about Serenity House and Shannon. *Id.* Chrivia stated that she had no concerns. *Id.* Otremba expressed displeasure with Shannon and her approach to the disputed complaint, commenting "Nobody speaks to my staff like that." *Id.* Otremba then shared that there was a goal of moving the Does to other placements, noting the reason was in part, because "the culture was different down there." *Id.* At the

---

Webster's Dictionary and the Oxford English Dictionary both acknowledge that 'their' can be either a singular gender-neutral pronoun or a plural pronoun.").

hearing, Otremba affirmed that she said "the culture was different down there" but explained that her comment did not have a racial connotation; she meant "[r]ural versus urban." ECF No. 17 at PageID.526.

### C. Agreement Termination

Later, Wellvance changed Serenity House's status in its system to "no new placements." ECF No. 1 at PageID.14. Then in April 2026, Chrivia learned at a meeting titled "Serenity AFC Moves" that Wellvance was intent on relocating the four Does. *Id.* at PageID.15. According to Chrivia, Wellvance's proffered reason at the meeting was that Serenity House increased its rates and Wellvance could not afford it. *Id.*

But at the motion hearing, Otremba testified that Serenity's proposed rate increase was not a factor. ECF No. 17 at PageID.522. Instead, Otremba stated that Wellvance bases its "decisions on medical necessity," and the decision to end the contract with Serenity House was in part because Serenity House had the second-highest number of resident complaints of all providers in Wellvance's system. *Id.* at PageID.523. Otremba added that the goal was always to bring the Does closer to their families and communities, which was ultimately in the Does' best interests. *Id.*; *see also* ECF No. 1 at PageID.16.

Wellvance's Chief Clinical Officer, Teresa McGee, clarified at the hearing that there had been an estimated eight complaints from Serenity House residents in

2025 and another four in 2026. ECF No. 17 at PageID.556. McGee admitted that only two were substantiated but argued that the number of unsubstantiated complaints is still "kind of an indication of level of satisfaction." *Id.* According to Chrivia, McGee had told Chrivia in a meeting that Shannon "is just not good. She is difficult to get along with." ECF No. 1 at PageID.16.

Shannon alleges that in May 2026, she contacted Otremba and Wellvance's Board of Directors to share her concerns about what she had learned and perceived as racial retaliation. ECF No. 1 at PageID.18. She and Chrivia also attended Wellvance's public board meeting to express their concerns and requests for internal review. *Id.* at PageID.19. But, according to Plaintiffs, the Board did not take any further action. *Id.* at PageID.20. Meanwhile, Chrivia consistently informed Wellvance that she, as the Does' guardian, did not consent to the Does being relocated, noting that they were the most stable that they had ever been and that the relocation lacked clinical justification. *Id.* at PageID.21. Despite this, on August 12, 2026, Wellvance notified Serenity House that it was terminating the Agreement, effective October 1, 2026. *Id.* at PageID.21–22; *see also* ECF No. 8-2 at PageID.298 (showing a notice of termination email from Wellvance to Serenity House, expiring on September 30, 2026).

## D. Procedural History

So on September 23, 2026, Plaintiffs sued Defendants and filed a motion for a TRO and PI. ECF Nos. 1; 3. In their Complaint, Plaintiffs alleged retaliation, race discrimination, and due process violations under several federal and state laws as follows:

| Count | Claim | Basis | Plaintiffs | Defendant(s) |
|---|---|---|---|---|
| I | First Amendment Retaliation | 42 U.S.C. § 1983 | Shannon and Serenity House | Both |
| II | Equal Protection Clause Race Discrimination | 42 U.S.C. § 1983 | Shannon and Serenity House | Both |
| III | Race Discrimination | 42 U.S.C. § 1981 | Serenity House | Both |
| IV | Retaliation | 42 U.S.C. § 1981 | Serenity House | Both |
| V | Race Discrimination and Retaliation | Title VI of the Civil Rights Act of 1964 | Shannon and Serenity House | Wellvance only |
| VI | Retaliation | Michigan's Elliott-Larsen Civil Right Act (ELCRA) | Shannon and Serenity House | Both |
| VII | Race Discrimination | ELCRA | Shannon and Serenity House | Both |
| VIII | Fourteenth Amendment Procedural Due Process | 42 U.S.C. § 1983 | Does 1-4—by their Guardian | Both |
| IX | Declaratory and Injunctive Relief | Michigan Mental Health Code | Does 1-4—by their Guardian | Wellvance only |

ECF No. 1 at PageID.27–39.

In their emergency motion, Plaintiffs specified that they sought a TRO in the event that this Court could not schedule a hearing on the PI before September 30. ECF No. 3 at PageID.137. Defendants opposed the motion on the merits and on jurisdiction, arguing that the terms of the Agreement required this federal dispute to be heard in the Western District of Michigan. ECF No. 8.

This Court held an evidentiary hearing on September 29, 2026. *See* ECF Nos. 6, 17. At the conclusion of that hearing, this Court granted Plaintiffs' motion for a preliminary injunction and ordered that the Agreement remain in effect for the next 120 days. *See* ECF No. 16 at PageID.451. This Opinion follows.

## II. LEGAL STANDARD

"Temporary restraining orders and preliminary injunctions are extraordinary remedies" that should be granted only if the movant demonstrates that the circumstances "clearly demand" it. *Koetje v. Norton*, No. 13-12739, 2013 WL 8475802, at *2 (E.D. Mich. Oct. 23, 2013); *see also Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). To determine whether to issue a TRO or a PI, courts consider the same four factors:

> (1) the movant's likelihood of success on the merits,
> (2) any irreparable injury to the movant without the injunction,
> (3) whether the balance of hardships favors the movant, and
> (4) whether an injunction would be adverse to the public interest.

*Muffler Man Supply Co. v. TSE Auto Serv., Inc.*, 739 F. Supp. 3d 598, 602 (E.D. Mich. 2024) (citing *Overstreet*, 305 F.3d at 573). "The standard for issuing a

temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on the irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *ABX Air, Inc. v. Int'l Bhd. of Teamsters*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016).

Although no one factor controls in every case, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a plaintiff's motion. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). The same is true if a plaintiff fails to establish irreparable harm. *See CLT Logistics v. River West Brands*, 777 F. Supp. 2d 1052, 1064 (E.D. Mich. 2011) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–21 (2008)). "It follows that a district court need not address all the preliminary injunction factors where fewer are dispositive of the issue." *Id.* Whether to grant a TRO or PI is a matter within the sound discretion of this Court. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007); *see also Dorsey v. Wilmington Savs. Fund Soc'y, FSB*, No. 24-10325, 2024 WL 1700992, at *3 (E.D. Mich. Feb. 29, 2024).

## III. DISCUSSION

Preliminarily, Defendants argue that this Court is not the proper venue because the Agreement states that "the venue for bringing any legal or equitable action under this Agreement . . . in Federal Court . . . shall be the Federal Judicial District of Michigan, Southern District, Western Division." ECF No. 8 at

PageID.232 (quoting §XVIII in the Agreement at ECF No. 1-2 at PageID.57). Putting aside the fact that this is likely a misstatement for the Western District of Michigan, this Court finds that the forum selection clause in the Agreement does not preclude Plaintiffs from moving in the Eastern District because their action is not "under this Agreement." *See Traton News, LLC v. Traton Corp.*, 914 F. Supp. 2d 901, 908 (S.D. Ohio 2012) (collecting cases). As this Court stated: "Although the [P]laintiffs' and the [D]efendants' relationship generally is one of contract, this particular case goes beyond simply a contract dispute." ECF No. 16 at PageID.446.

Furthermore, the Parties operate in the Eastern District of Michigan and events giving rise to the action took place there, too. *See* 28 U.S.C. § 1391(b); *see also* ECF Nos. 1 at PageID.4 (stating that "[b]oth Defendants reside in this District, and a substantial part of the events giving rise to the claims occurred in this District, including Ogemaw, Iosco, Oakland, Macomb, and Wayne Counties"); 16 at PageID.466 (noting that Defendants operate in the Eastern District and the Plaintiff "Does are in the Eastern District"). Therefore, this Court finds that the

Eastern District of Michigan is an appropriate venue for this case. *See* 28 U.S.C. § 1391(b).

**A. Likelihood of Success on the Merits**

Plaintiffs bring two main types of claims under multiple federal and state statutes: retaliation and race discrimination.[3] *See* ECF No. 1 at PageID.27–39. Plaintiffs argue that Defendants retaliated against them after Shannon challenged the substantiated resident complaint and discriminated against Shannon and her company, as one of the only African-American run facilities, when Defendants terminated the Agreement for nonlegitimate reasons. *See id.*; *see also* ECF No. 3 at PageID.145–59. Defendants respond that the decision to terminate the Agreement was not based on retaliation or racial animus but rather to support the Does' best

[3] The Doe Plaintiffs, by their Guardian, also brought a claim about Fourteenth Amendment due process. *See* ECF No. 1 at PageID.37–39. But Plaintiffs did not move for a PI on this ground. *See* ECF No. 3. "Where multiple claims are at issue, the movant need only show a likelihood of success on the merits of one claim." *Doe v. Edlow*, 836 F. Supp. 3d 775, 811 (S.D. Ohio 2026) (citing *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)). Therefore, this Court focuses on the retaliation and race discrimination claims to form the basis of its Opinion and Order granting a PI. For the same reasons, this Court focuses on the analysis that applies to Plaintiffs' claims under §§ 1981, 1983, and ELCRA without further addressing the distinctive analysis for race discrimination and retaliation claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. *See id.*; *compare Coal. for Advancement of Reg'l Transp. v. Fed. Admin.*, 576 F. App'x 477, 493 (6th Cir. 2014) (outlining that a Title VI race discrimination claim requires showing discriminatory intent when excluding the plaintiff from a federally financed program) *with Gardner*, 520 F. Supp. 2d at 864–65 (using the *McDonnell Douglas* framework to analyze race discrimination claims under §§ 1981, 1983, and ELCRA).

interests by bringing them closer to their home communities. ECF No. 8 at PageID.238–39. For the reasons provided on the record at the hearing and further articulated below, this Court finds that Plaintiffs have shown a likelihood of success on the merits.

The elements for retaliation and race discrimination under 42 U.S.C. §§ 1981, 1983,[4] and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") "are the same." *Johnson v. Aston Carter, Inc.*, No. 22-CV-10025, 2022 WL 1695768, at *8 (E.D. Mich. May 26, 2022) ("The legal standards governing discrimination and retaliation claims under . . . § 1981[] and the ELCRA are the same.") (collecting cases). *See also Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018); *Gardner v. Wayne Cnty.*, 520 F. Supp. 2d 858, 864 (E.D. Mich. 2007) ("The court's analysis in determining the merit of [the plaintiff's] race discrimination claims under ELCRA, § 1981, [and] § 1983 . . . are the same.").

*1. Retaliation*

For a federal retaliation claim, "a plaintiff must show that (1) the plaintiff was participating in a constitutionally protected activity; (2) the defendant's action injured the plaintiff in a way likely to deter a person of ordinary firmness from

[4] This Court finds for purposes of ruling on the motion for a PI that Plaintiffs have shown Defendants could be liable under § 1983 because Wellvance is a municipal entity and Otremba acted in her official capacity to terminate the Agreement. *See Monnell v. Dep't of Soc Servs.*, 436 U.S. 658, 694 (1978).

further participation in that activity; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 371 (6th Cir. 2011); *see also Bromley v. Parisian, Inc.*, 55 F. App'x 232, 236 (6th Cir. 2002) (outlining the same core standards for ELCRA claims with the addition of the defendant knowing that the plaintiff engaged in a protected activity).

a. Protected Activity and Adverse Action

Where the adverse action is termination of a contract between a government entity and an independent contractor, courts "determine whether [her] speech is constitutionally protected by asking first if the speech relates to a matter of public concern and, if so, balancing whether the employee's free speech interests outweigh the efficiency interests of the government." *Faraone v. Heath*, 724 F. App'x 410, 412 (6th Cir. 2018) (internal quotation marks and citations omitted); *see also Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 688, 685 (1996) (holding that the independent contractor "must show that the termination of [her] contract was motivated by [her] speech on a matter of public concern"). Courts consider "the content, form, and context of a given statement" to determine whether speech addresses matters of public concern. *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). "Speech which can be fairly considered as relating to any matter of political, social, or other concern to the community touches upon matters of public

concern." *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001) (internal quotation marks and citation omitted).

Here, Defendants were aware of Shannon's speech expressed at the public board meeting, namely her challenges to Defendants' decision to terminate the Agreement, which she decried as racially motivated. *See* ECF No. 1 at PageID.19. Plaintiffs have shown likely success on their claims that this protected speech, because the "right to protest racial discrimination [is] a matter inherently of public concern." *Connick*, 862 U.S. at 148 n.8. And, as established, terminating a contract is an adverse action. *See Umbehr*, 518 U.S. at 685; *see also Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 414–15 (6th Cir. 2011) (collecting cases).

Having likely shown that her speech is constitutionally protected in commenting upon a matter of public concern, this Court must balance Plaintiffs' speech interests against Wellvance as a municipal entity's interests "in promoting the efficiency of the public services it performs through its [independent contractors]." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). At this early stage, this Court finds a likelihood of success for Plaintiffs under the balancing test as well, where Plaintiffs' First Amendment interests in protesting racial discrimination outweigh any efficiency interests Defendants may have had in

terminating the Agreement.[5] Indeed, considering the time, place, and manner of Shannon's speech, Wellvance has not shown that her comments at the public board meeting disrupted or impaired Wellvance's operations. *See, e.g.*, *Rowell v. Madison Cnty.*, No. 07-cv-1123, 2009 WL 1918078, at *8 (W.D. Tenn. July 2, 2009) (noting that "the [d]efendant bears the burden of justifying its employment decisions, which it may attempt to do through presentation of the impact of the statement on the County's legitimate organizational interests" and finding that the defendant did not show that the plaintiff's speech disrupted its ability to provide public services (citation modified)).

b. Motivation

Finally, to show likelihood of success on the merits of a First Amendment retaliation claim, the plaintiff must show that her speech was a motivating factor in the defendant's decision to terminate her contract. *See Napolitano*, 648 F.3d at 371.

[5] This Court notes that Defendants did not present any evidence or argument on this prong. In fact, both Parties failed to introduce the relevant tests, and this Court is left to interpret the Parties' arguments within these tests' frameworks for the first time at this stage and without the aid of the Parties' briefs. Thus, at best, this Court observes that Wellvance espoused several reasons for terminating the Agreement, but promoting efficiency was not obviously one of them. Therefore, this Court finds that Defendants have not met their burden of demonstrating that terminating the Agreement promoted an efficiency that outweighs Plaintiffs' constitutional interests. *See generally Myers v. City of Centerville, Ohio*, 41 F.4th 746, 764 (6th Cir. 2022) (identifying the *Pickering* test as a burden on defendants to show that the "potential disruptiveness" of the plaintiff's speech outweighed First Amendment valuation of that speech).

If the defendant articulates a legitimate, nondiscriminatory reason where the contract would have been terminated regardless, the plaintiff can rebut this reason with evidence that it is pretext. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008).

Here, Plaintiffs showed evidence that terminating the Agreement was significantly motivated by Shannon's conduct, noting that McGee said Shannon "is just not good. She is difficult to get along with," and that Otremba talked about the culture being "different down there" while discussing plans to move the Does out of Serenity House. *See* ECF No. 1 at PageID.13, 17 at PageID.469, 594. And the timing shows a causal connection, where Shannon challenged the substantiation some time in February 2026 and by February 27, Otremba discussed plans to move the Does. *See* ECF Nos. 1 at PageID.12–13; 16 at PageID.448 (finding a likelihood of success on the merits, in part, "because of the timing"); *see also Chambers v. City of Detroit*, 786 F. Supp. 2d 1253, 1268 (E.D. Mich. 2011) ("Where an adverse action occurs shortly after protected activity, the close temporal connection raises an inference that satisfies the causal connection for purposes of making out a *prima facie* case [of retaliation].")

And Defendants did not present a consistent and clear reason for terminating the Agreement, mentioning location and cost at times and while later asserting that cost is "never" a factor. *Compare* ECF No. 1 at PageID.15 (mentioning Serenity

House's increased rates as the reason for planning to terminate the Agreement), and ECF No. 8 at PageID.238 (describing increased rates as a legitimate concern), *with* ECF No. 16 at PageID.447 ("Both sides state that the explanation for the relocation or nonrenewal of this contract was not simply cost."), and ECF No. 17 at PageID.555, 582 (McGee testifying that "cost is never a factor" except insofar as considering whether Wellvance is "getting what we're paying for"). At the hearing, Defendants mentioned resident complaints and the Does' best interests of moving closer to their communities. *See* ECF No. 17 at PageID.523, 556.

But Plaintiffs have provided evidence that these reasons are pretext because only two of the twelve complaints were substantiated and "[n]one had to do with health and safety. At no point did [D]efendants believe that the residents were in any danger being in their current living conditions such that they needed to move them out immediately, which they have the right to do." ECF No. 16 at PageID.447. *See Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (outlining that evidence of pretext can include showing that the reason offered "(1) has no basis in fact; (2) did not actually motivate the adverse [] action; or (3) was insufficient to warrant the adverse action"). Plus, Plaintiffs have a facility closer to the Does' communities that Defendants did not consider, *see* ECF No. 17 at PageID.477, and the Does' guardian Chrivia does not consent to the Does moving because she does not think moving the Does is in their best interests, *see id.* at PageID.544, 601. Thus,

Plaintiffs have shown evidence that resident complaints and the Does' best interests are pretextual reasons that were not based in fact, "did not actually motivate" terminating the Agreement, or were generally "insufficient to warrant" terminating the Agreement. *See Ladd*, 552 F.3d at 502.

Therefore, this Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of at least some of their retaliation claims. *See generally Cooperrider v. Woods*, 127 F.4th 1019, 1038–39 (6th Cir. 2025) (holding that the plaintiff had shown adequate allegations of retaliation on the basis of the complaint); *see also Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001) (outlining the elements of a *prima facie* case of retaliation under ELCRA, which include showing that the plaintiff's protected activity was a significant factor in the defendant's adverse action).

*2. Race Discrimination*

For race discrimination, a plaintiff must prove three elements to succeed on a claim of race discrimination: "(1) that she belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against her on the basis of race; and (3) the defendant's discriminatory conduct abridged a right" under these statutes. *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) (citation modified). These statutes protect individuals' rights to

make and enforce contracts with public and private actors. *McCrary v. Oakwood Healthcare, Inc.*, 170 F. Supp. 3d 981, 986 (E.D. Mich. 2016).

Here, Plaintiffs satisfied the first element because Shannon is an African-American woman who owns and runs Serenity House. *See* ECF No. 1 at PageID.5; *see also D.J. Miller & Assocs., Inc. v. Ohio Dep't of Admin. Servs.*, 115 F. Supp. 2d 872, 879 (S.D. Ohio 2000) (finding that "a minority-owned business[] is a member of a protected class"). The same evidence Plaintiffs provided for their retaliation claims about racial animus supports a likelihood of success for their discrimination claims as well. *See* ECF No. 16 at PageID.447 (recounting Otremba's comments about "the culture [being] different down there," and Defendants' efforts to relocate the Does despite the lack of consent from their guardian); *see also Johnson*, 2022 WL 1695768, at *8 ("The legal standards governing discrimination and retaliation claims under . . . § 1981[] and the ELCRA are the same."). For the third element, Plaintiffs have shown evidence that Defendants' conduct abridged their rights to contract with public actors by terminating the Agreement. *See McCrary*, 170 F. Supp. 3d at 986. For these reasons, this Court finds that Plaintiffs have demonstrated a strong likelihood of success on the merits of at least some of their race discrimination claims. *See id.* (finding that a reasonable jury could find that the defendant's actions were based on racial preferences).

## B. Irreparable Injury

Next, this Court considers whether Plaintiffs will suffer irreparable injury without a preliminary injunction. Plaintiffs argue "loss of First Amendment freedoms"; harm to Serenity House's reputation, goodwill, and business relationships with the Wellvance network; and harm to the Does' mental health and wellbeing by removing them from their residence where they are currently stable. ECF No. 3 at PageID.149–50. Defendants argue that Plaintiffs have not provided adequate evidence that the Does will be harmed and that "[t]hree of the four [Does] have asked to be moved." ECF No. 8 at PageID.240–41. For the reasons provided on the record at the hearing and further articulated below, this Court finds that Plaintiffs have shown threat of irreparable injury to warrant a preliminary injunction.

"To be granted an injunction, the plaintiff must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002) (internal quotation marks and citation omitted). A moving party suffers irreparable harm if the harm "is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). "The loss of customer goodwill

often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512.

Plaintiffs Shannon and Serenity House have alleged harm to their business reputation and loss of goodwill "among community mental health programs and prepaid inpatient health plans" by losing "its relationship with the Wellvance network." ECF No. 3 at PageID.150. This harm goes beyond financial harm that could be remedied with money damages. *See Basicomputer Corp.*, 973 F.2d at 511–12.

But more significant is the threat of irreparable harm to the Does. The Parties did not dispute that the Does were stable and that their guardian Chrivia supported their placement at Serenity House. *See* ECF No. 16 at PageID.449. Courts recognize threats to patients' stability at their residencies as a threat of irreparable harm. *See generally, e.g.*, *Parents' League for Effective Autism Servs. v. Jones-Kelley*, 339 F. App'x 542, 552 (6th Cir. 2009) (holding that the district court did not abuse its discretion by granting a PI for plaintiff children who claimed they would "suffer irreparable injury in the form of severe regression of symptoms" by losing access to their service provider); *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 364 (6th Cir. 2000) (noting that patients having to be discharged and transferred can be a relevant factor in evaluating irreparable harm); *Sudar v. Nev. Hand, Inc.*, No. 2:26-CV-02103, 2026 WL 2119309, at *4 (D. Nev. July 22, 2026) (finding that

the "[p]laintiff faces a likelihood of irreparable harm if forced to relocate from his current apartment without a reasonable accommodation, as he will likely endure physical and mental trauma compounded by his current disabilities").

As this Court opined at the hearing:

> Where the harm would certainly occur is if they were moved from this location in a hurried and unplanned-out way and if the parties are claiming that this particular contract runs out tomorrow and defendants reserve their right to move their people tomorrow, that would be a huge irreparable harm to the Doe plaintiffs.
>
> It is undisputed that the reason why these individuals are under guardianship and care is because they are fragile and need to be taken care of by others, and I am not going to say that they have to stay at Serenity House forever, but they do have to be able to stay there for enough time to allow a more reasonable transition of these people to another location, if indeed that is what is clinically best for them and appropriate under the circumstances.

ECF No. 16 at PageID.449. Given Plaintiffs provided ample evidence that the Does were stable, that their guardian did not consent to them moving, and that there is a likelihood of regression should they be moved abruptly, this Court finds that Plaintiffs have satisfied the "irreparable harm" element to warrant a PI.

### C. Balance of Hardships

Having found a likelihood of success on the merits and the threat of irreparable injury to Plaintiffs, "[i]t follows that [this Court] need not address all preliminary injunction factors where fewer are dispositive of the issue." *CLT Logistics*, 777 F. Supp. 2d at 1064 (citing *In re DeLorean Motor Co.*, 755 F.2d 1223,

1229 (6th Cir. 1985)). But this Court notes that the balance of hardships weighs in Plaintiffs' favor as well, because the harm to Defendants' business autonomy of not being able to "move people exactly when and where they want to . . . is not an irreparable harm, and it certainly does not outweigh the harm that would happen to the Does when and if they were moved in a hurried and unplanned fashion." ECF No. 16 at PageID.450. This Court elaborated: "[T]he harm of having to move the [Does] in a very hurried fashion is much more weighty than[] the harm of not allowing the [Does] to immediately move to where they had previously grown up or where their current family is" because that is not irreparable harm and "[t]hey have already been outside of that community for several years. A couple more months is not going to change anything significantly." *Id.*; *see generally Cathedral Rock*, 223 F.3d at 364; *Sudar*, 2026 WL 2119309, at *4. Similarly, the harm to Plaintiffs' business outweighs Defendants having to wait to relocate the Does. *See D.J Miller*, 115 F. Supp. 2d at 884 ("[T]he harm suffered by the victim of discrimination will almost always outweigh the inconvenience to others."); *see also Muffler Man*, 739 F. Supp. 3d at 604 (acknowledging that harm to defendants is relevant to this factor's inquiry but that it is not outweighed by the harm to the plaintiff).

Thus, the balance of hardships factor weighs in favor of granting a PI. *See Muffler Man*, 739 F. Supp. 3d at 604; *see also Sudar*, 2026 WL 2119309, at *4 (finding that the balance of hardships weighed in the plaintiff's favor because him

being forced to relocate would likely cause physical and mental trauma compared to defendants having to "suffer, at most, a delay of their planned renovation" of the plaintiff's residence).

### D. Public Interest

Finally, this Court finds that "[t]here is a public interest in ensuring that constitutional rights are protected." ECF No. 16 at PageID.451. *See Grutter v. Bollinger*, 137 F. Supp. 2d 874, 879 (E.D. Mich. 2001) ("There is also a strong public interest in ensuring that public institutions comply with the Constitution."). And there is "a public interest in protecting the health and welfare of people with mental health issues and making sure that any moves are done because of clinical and not discriminatory reasons." ECF No. 16 at PageID.451. *See Welch v. Brown*, 935 F. Supp. 2d 875, 889 (E.D. Mich. 2013) ("[T]he public interest weighs in favor of ensuring continuing health care to members of the public."). Although generally enforcing contract provisions is also in the public interest, *see Certified Restoration*, 511 F.3d at 551, and here, the Agreement allows for termination for any reason, this Court notes that termination cannot be for a discriminatory reason. ECF No. 16 at PageID.451.

At bottom, this Court finds that Plaintiffs have demonstrated that all four factors support granting a preliminary injunction, and this Court will grant it for 120 days.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 3, is **GRANTED**.

It is further **ORDERED**, to preserve the status quo, Defendants are **ENJOINED from terminating the Agreement** between Plaintiff Serenity House Residential Care Services, LLC and Wellvance Community Mental Health Authority and their contracting officers, **for 120 days**, beginning September 29, 2026.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: November 19, 2026